UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| FUNDS IN THE AMOUNT OF $216,600 | ) |
| IN UNITED STATES CURRENCY, | ) |
| | ) |
| Defendant. | ) |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

The United States of America, by MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, for its verified complaint against the above-named defendant property and in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure alleges as follows:

**I.    NATURE OF THE ACTION**

1. This is a civil action brought to forfeit property seized by the United States government for violations of federal law that provide for the seizure, forfeiture, and disposal of certain property to the United States.

2. This action is an *in rem* legal proceeding against property, not against an individual, to determine rights in the property that are conclusive against the entire world.

3. This complaint is verified by the attached Verification of Sean Pavelich, Internal Revenue Service ("IRS") Special Agent ("SA Sean Pavelich"), which is fully incorporated herein.

## II. DEFENDANT *IN REM*

4. The Defendant *in rem* consists of funds in the amount of $216,600 in United States currency (the "defendant property").

5. The defendant property was seized on or about June 1, 2022.

6. The defendant property is currently in the custody of the Internal Revenue Service.

## III. JURISDICTION AND VENUE

7. This Court has jurisdiction over an action commenced by the United States under Title 28, United States Code, Section 1345, and over an action for forfeiture under Title 28, United States Code, Section 1355(a).

8. This Court has *in rem* jurisdiction over the defendant property pursuant to Title 28, United States Code, Section 1355(b)(1)(A), because acts giving rise to this action occurred within the Northern District of Illinois.

9. Venue is proper in the Northern District of Illinois pursuant to Title 28, United States Code, Section 1395(b)(1)(A) because acts giving rise to this action occurred in this district.

## IV. BASIS FOR FORFEITURE

10. The defendant property is subject to forfeiture pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(A), as property involved in a transaction or attempted transaction in violation of Title 18, United States Code, Sections 1956(a)(1) or 1957, or any property traceable to such property. The defendant property is further subject to forfeiture pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C), as property that constitutes and is derived from

proceeds traceable to violations of Title 18, United States Code, Sections 1343, 1956(a)(1), or 1957.

**A.     The Paycheck Protection Program**

11.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

12.     In order to obtain a PPP loan, a qualifying business must submit a PPPloan application, which is signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

13.     A PPP loan application must be processed by a participating lender. If a PPP loan application is approved, the participating lender funds the PPP loan using its

3

own monies, which are 100% guaranteed by Small Business Administration ("SBA"). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

14. PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven by the SBA if the business spends the loan proceeds on these expense items within a designated period of time and at least 60 percent of the PPP loan is used for payroll expenses.

**B.     Economic Injury Disaster Loans (EIDL)**

15. Another source of relief provided by the CARES Act was the expansion of the Economic Injury Disaster Loan ("EIDL") Program, which provided loan assistance (including advances of up to $10,000) for businesses with 500 or fewer employees and other eligible entities for loans up to $150,000. The EIDL Program was designed to provide economic relief to small businesses that are experiencing a temporary loss of revenue.

16. According to documents on the SBA's website, EIDL is a 30-year direct loan program that provides up to six months of working capital for small businesses to meet financial obligations and operating expenses that could have been met had the COVID-19 disaster not occurred. Unlike the SBA's Paycheck Protection Program loans, EIDL program loans are not forgivable and must be repaid by the borrower. According to the terms of the program, EIDL proceeds can be used to cover a wide array of working capital and normal operating expenses, such as continuation of health care benefits, rent,

utilities, and fixed debt payments. Recipients of EIDL funds are required to retain receipts and contracts for all loan funds spent for three years.

17. To gain access to funds through the EIDL Program, small businesses applied through the SBA via an online portal and application. As part of the EIDL application process, the SBA required applicants to submit truthful information concerning the business and the business owner, including information as to the gross revenues and the cost of goods sold for the business during the twelve (12) months prior to January 31, 2020. Applicants were required to electronically certify that the information provided was accurate and were warned that any false statement or misrepresentation to the SBA may result in sanctions, including criminal penalties.

18. EIDL funds were issued to the small business applicants directly from the United States Treasury.

19. The EIDL Advance was a grant program offered together with the EIDL program. The amount of the advance issued to the small business applicant was determined by the number of employees indicated on the EIDL application, $1,000 per employee, up to $10,000.

### C. Illinois' Back to Business Grant Program

20. One source of relief provided for businesses impacted by the COVID-19 pandemic was the Illinois Department of Commerce and Economic Opportunity (DCEO)'s Back to Business Grant Program (B2B), which provided grants of between $5,000 and $150,000 to qualified small businesses that lost revenue due to economic disruptions related to the COVID-19 pandemic.

21. To gain access to funds through the B2B program, qualified businesses applied through community organizations, using an online portal and application. Allies for Community Business ("Allies") was one of those community organizations. As part of the application process, DCEO required applicants to submit truthful information concerning the business and business owner, including the month and year in which the business began operating and the business's actual sales or gross receipts as reported on its tax returns for tax years 2019 and 2020, as well as one business bank statement demonstrating business expenses between April and December 2020, and the business's most recent bank statement.

22. The nature of the small business, its period of operations, its sales and gross receipts, as well as its current and prior business activity, were all material to DCEO's decision to extend a grant to an applicant.

## V.  SUMMARY OF FACTS

23. Kimberly Ray-Duncan is charged by indictment with engaging in a wire fraud scheme to defraud the SBA with respect to EIDL and PPP loans, and the state of Illinois with respect to Back2Business grants, which loans she obtained and attempted to obtain for businesses she claimed to operate. *United States v. Ray-Duncan,* 23 CR 96.

24. In addition to the fraudulent applications she submitted on her own behalf, and which she is charged with submitting in case 23 CR 96, Ray-Duncan prepared, caused to be prepared, and submitted and caused to be submitted at least 45 false and fraudulent applications for PPP loans for 45 separate individuals. Many of those loans were funded, and Ray-Duncan collected a percentage of those loans as payment for preparing and submitting the false and fraudulent applications.

25. In summary and as set forth in more detail below, Ray-Duncan has obtained proceeds of wire fraud, much of which she has laundered through bank accounts that she holds.

### 1. Proceeds of PPP Loan Fraud Deposited to Account X589-1

26. According to records held by Illiana Financial, the account ending in X589-1, in the name of "The Kay Ray Duncan Network LLC", was opened by Kimberly Ray-Duncan on August 5, 2020. On that same date, Ray-Duncan deposited six cashier's checks payable to The Kay Ray Duncan Network LLC, totaling $103,138, and on August 7, 2020, Ray Duncan deposited five cashier's checks payable to The Kay Ray Duncan Network LLC totaling $125,218.62. The 11 cashier's checks were from individuals or entities who, according to documents received from lenders, received PPP loans after submission of applications from an IP address which, according to AT&T records, was assigned to Ray-Duncan's residence. All 11 cashier's checks were purchased soon after each of those individuals and entities received the requested PPP loan funds. The majority of the cashier's checks represented 25% of the PPP loans awarded to the individual who issued the cashier's check to Ray-Duncan. According to records received from Kabbage, Inc., the fraudulent PPP loan applications resulted in the issuance of PPP loans totaling $1.04 million.

### 2. August 5, 2020, Deposits

27. On August 5, 2020, six cashier's checks payable to The Kay Ray Duncan Network LLC, totaling $103,138, were deposited to the account ending in X589. According to records received from Kabbage, Inc., the cashier's checks were from five individuals/entities who had applied for and received PPP loans, and all of the cashier's

checks to "The Kay Ray Duncan Network LLC" were funded within 7 days of the deposit of the PPP loan funds to the accounts of the five entities.

28. According to review of records for four of the five bank accounts on which the cashier's checks were drawn, following receipt of the PPP loan, the loan proceeds were withdrawn in cash, cashier's checks, and transfers to other accounts within approximately one month of the receipt of the PPP loan by that entity. Further, in a one of the accounts, opened in the name of Nonchalant LLC, the account was opened on June 18, 2020, and there was no business activity reflected in the account other than the disposition of the PPP loan proceeds by cash withdrawal, transfer to other accounts with no activity, personal debits, and a cashier's check.

### 3. August 7, 2020, Deposits

29. On August 7, 2020, five cashier's checks payable to The Kay Ray Duncan Network LLC, totaling $125,218.62, were deposited to the Illiana Financial account ending in X589-1, held in the name of the Kay Ray Duncan Network LLC. According to records received from Kabbage, Inc., the cashier's checks were from five individuals/entities who had applied for and received PPP loans, and all of the cashier's checks to "The Kay Ray Duncan Network LLC" were funded within a day or the same day of the deposit of the PPP loan funds.

30. Based on a review of records for the five bank accounts on which the cashier's checks were drawn, following receipt of the PPP loan, the loan proceeds were withdrawn in cash, debt payments, payments via Zelle, cashier's checks, and transfers to other accounts. Activity consistent with the operation of an ongoing business, such as

rent payments, equipment payments, insurance, utilities, customer deposits, etc., were not observed in the accounts.

### 4. Disposition of Kay Ray Network Funds from the August 5 and 7, 2020 Deposits

31. Following the two large deposits on August 5 and August 7, 2020, described above, Ray-Duncan withdrew nearly all of the funds from Illinois Financial account X589-1 as follows:

    a. On August 20, 2020, Ray Duncan transferred $36,890 to Illiana account X925-1, a personal account for Kimberly Ray-Duncan, and withdrew $60,000 in six $10,000 cashier's checks, all payable to Kimberly Ray-Duncan. The $60,000 was used towards the purchase of a yacht.

    b. On August 25, 2020, Ray-Duncan withdrew $125,000 in cashier's checks, all payable to Kimberly Ray Duncan. $120,000 of those funds were used towards the purchase of a yacht. The balance in account X589-1 at close of business on 8/25/2020 was $1,446.72.

### D. Proceeds of PPP Fraud Deposited to Account X925-1

32. On September 5, 2020, one cashier's check payable to The Kay Ray Duncan Network LLC, totaling $19,532.00, was deposited to Ray-Duncan's personal bank account ending in X925-1 at the Illiana Financial Credit Union. According to records received from Kabbage, Inc., the cashier's check was from an individual/entity who had applied for and received a PPP loan in the amount of $78,128, and the cashier's check to "The Kay Ray Duncan Network LLC" was funded within 2 days of the deposit of the PPP loan funds.

33. Following the deposit on September 5, 2020, of the $19,532.00 cashier's check to Ray-Duncan's personal account ending in X925-1, Ray-Duncan made a $19,000 cash withdrawal from the X925-1 account on September 21, 2020.

### 5. Additional Fraudulent PPP Loans Obtained by Ray-Duncan.

34. In addition to the above loans, for which she deposited her share of the proceeds to her bank accounts, RAY-DUNCAN also filed PPP loans for at least 33 other individuals from the IP address assigned to her residence; of those applications, 9 were approved, and 6 were funded. In total, the individuals for whom RAY-DUNCAN applied for PPP loans received a total of $464,494 in loan funds to which they were not entitled. Based on the amount of commission that Ray-Duncan typically charged for loan preparation services, she would have received approximately $116,123.50 in commission from the loan recipients.

### E. October 14, 2020 Deposit of EIDL Proceeds

35. On or about September 30, 2020, Ray-Duncan fraudulently applied for an EIDL loan for "K Ray-Duncan Assembly Company." In support of that application, she submitted fraudulently altered bank statements and claimed income and employees for which the IRS had no record. As a result of Ray-Duncan's false representations, on or about October 14, 2020, the SBA issued an EIDL loan to "K Ray Duncan Assembly Company" and electronically deposited $149,900 into an account ending in X318-1 at Illiana Financial Credit Union, which was controlled by Ray-Duncan and opened in the name of "K Ray-Duncan Assembly Company" on June 24, 2020.

36. On the same day that the EIDL loan funds were deposited in her account, Ray-Duncan withdrew $145,000, which she used to purchase 14 $10,000 cashier's checks

and one $5,000 cashier's check, all payable to "K Ray-Duncan Assembly Company." The disposition of those checks were as follows:

    a.    The $5,000 cashier's check was negotiated by Ray-Duncan three months later in January 2021 in exchange for currency.

    b.    Three of the cashier's checks, totaling $30,000, were negotiated by Ray-Duncan approximately six months later in May 2021 and used to purchase a yacht.

    c.    Two of the cashier's checks, totaling $20,000, were negotiated by Ray-Duncan approximately eight months later in June 2021 in exchange for currency.

    d.    Nine of the cashier's checks, totaling $90,000, were negotiated by Ray-Duncan approximately twelve months later in October 2021 to purchase nine new $10,000 cashier's checks at Illiana Financial, all payable to "K Ray-Duncan Assembly Company" (the "KRD Assembly Checks"). On May 13, 2022, Ray-Duncan deposited two of the KRD Assembly Checks to an Illiana Financial Credit Union account held in her name and ending in X925-1, along with 8 cashier's checks representing the proceeds of a separate fraud on the state of Illinois' Back to Business Grant Program, as discussed in Section F, below, as well as other cashier's checks. As discussed below in paragraph 40, following that deposit, Ray-Duncan used $120,000 of the funds in her account to purchase a $120,000 cashier's check payable to Individual JM.

    **F.**    **Fraudulently Obtained Grant Funds from Illinois' Back to Business Grant Program**

    37.    On or about September 30, 2021, Ray-Duncan applied, through Allies for Community Business, for a Back to Business grant for a company named "An AlKymAri Production LLC," which she falsely claimed was in the industry of professional, scientific,

11

and technical services, and had been in business since July 2016. Ray-Duncan claimed that An AlKymAri Production LLC had gross receipts of $702,121 in 2019, and $117,043 in 2020. In support of her loan application for An AlKymAri Production LLC, Ray-Duncan submitted false and fraudulent tax return documents and bank records.

38. As a result of Ray-Duncan's false representations and certification, DCEO authorized Allies to disburse a $100,000 grant to Ray-Duncan, which was wired into Ray-Duncan's Illiana Financial bank account ending in X925-1.

39. According to Illiana Financial bank records, on March 18, 2022, the day that the $100,000 loan was deposited into Ray-Duncan's bank account, Ray-Duncan withdrew $100,000 from that account in the form of 10 $10,000 cashier's checks payable to her (collectively, the "AlKymAri Checks").

40. According to Illiana Financial records, on May 13, 2022, RAY DUNCAN:

    a. deposited 17 $10,000 cashier's checks, consisting of 8 of the 10 AlKymAri Checks, totaling $80,000, two of the nine KRD Assembly Checks discussed above in Section A, and 7 other cashier's checks, in her Illiana Financial account ending in X925-1;

    b. withdrew $50,000 in cash from the account ending in X925-1; and

    c. used the funds in the X925-1 account, including the $80,000 from the deposit of the AlKymAri Checks and the $20,000 from the deposit of the KRD Assembly Checks, to purchase a $120,000 cashier's check, number 382519, payable to "[Individual JM] Re: Kimberly R Ray-Duncan."

41. Prior to the deposit of the 17 cashier's checks on May 13, 2022, there was approximately $20 in the X925-1 account.

42. According to Illiana Financial records, on May 18, 2022, Ray-Duncan negotiated the two remaining $10,000 AlKymAri Checks in Illiana Financial along with 6 other cashier's checks, totaling $78,000 in cashier's checks. She deposited $1,200 of those funds in the account ending in X925-2 and received $76,800 in cash.

## CONCLUSION

60. For the reasons set forth above, the foregoing defendant property was involved in a transaction or attempted transaction in violation of section 1956(a)(1) or 1957, or is property traceable to such property, and therefore is subject to forfeiture and condemnation pursuant to Title 18, United States Code, Section 981(a)(1)(A). Furthermore, the foregoing defendant property was derived from proceeds traceable to violations of Title 18, United States Code, Sections 1343, 1956(a)(1) or 1957, and therefore are subject to forfeiture and condemnation pursuant to Title 18, United States Code, Section 981(a)(1)(C).

WHEREFORE, based upon the aforementioned facts and circumstances, Plaintiff, United States of America, by and through its undersigned counsel, and pursuant to Fed. R. Civ. P. Supp. G(3)(b), respectfully, prays:

1) That process issue for arrest warrant *in rem* for the defendant property, which Plaintiff will execute in accordance with 28 U.S.C. § 1355(d) and Fed. R. Civ. P. Supp. G(3)(c);

2) That due notice be given to all parties to appear and show cause why forfeiture of the defendant property to the United States in accordance with the claims herein set forth should not be decreed;

3) That this Court enter a judgment of forfeiture for the defendant property to the United States; and

4) That this Court grant Plaintiff all other relief as it may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By: *s/Maureen Merin*
MAUREEN MERIN
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

**VERIFICATION**

I, Sean Pavelich, declare under penalty of perjury the following:

1. I am a Special Agent with the Internal Revenue Service - Criminal Investigation. I have been so employed since approximately 2020. As part of my duties as Internal Revenue Service - Criminal Investigation Special Agent, I investigate criminal violations of the Internal Revenue code and other financial offenses, including, but not limited to Title 18, United States Code, Sections 1956, and 1957 (money laundering offenses), and Title 18, United States Code, Sections 1343 (wire fraud) to the extent the activity under investigation affects tax administration. I have participated in investigations involving the analysis of financial records, the debriefing of witnesses, undercover operations, and surveillance. I have participated in the execution of multiple federal search and seizure warrants.

2. I have read the complaint in this matter and the facts alleged are true and correct to the best of my knowledge and belief based upon my own personal knowledge as well as information I have received from other agents, persons and documents, and it does not include each and every fact known to me concerning this investigation.

3. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 6/20/2024

Sean Pavelich
Special Agent
Internal Revenue Service - Criminal Investigations